[Cite as *State v. McKinney*, 2014-Ohio-5591.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
ERIE COUNTY

State of Ohio                                              Court of Appeals No.  E-13-008

      Appellee                                           Trial Court No.  2012-CR-195

v.

Robert W. McKinney                               **DECISION AND JUDGMENT**

      Appellant                                          Decided:  December 19, 2014

* * * * *

Kevin J. Baxter, Erie County Prosecuting Attorney, and Mary Ann
Barylski and Frank Romeo Zeleznikar, Assistant Prosecuting Attorneys,
for appellee.

Edward J. Stechschulte, for appellant.

* * * * *

**OSOWIK, J.**

{¶ 1} This is an appeal from a judgment of the Erie County Court of Common

Pleas that found appellant guilty of one count of assault in violation of R.C. 2903.13(A),

a first degree misdemeanor. For the reasons that follow, the judgment of the trial court is affirmed.

{¶ 2} The undisputed facts relevant to the issues raised on appeal are as follows. On June 13, 2012, appellant was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(2) in connection with an assault upon Dwayne Jarrell on March 24, 2012, at the Vermillion County Club ("the club"). Appellant entered a plea of not guilty to the charge and on January 15, 2013, trial to a jury commenced.

{¶ 3} The state presented the testimony of eight witnesses. First to testify was Sgt. Daniel McGlothlin, with the Erie County Sheriff's Office, who responded to a call on March 24, 2012, reporting a fight at the Vermillion Country Club. When McGlothlin arrived, the suspect had left and several deputies were talking to Dwayne Jarrell, the victim. McGlothlin attempted to gather information from two witnesses at the bar who he was told had been sitting with appellant, but found them to be "uncooperative." The sergeant did not speak directly with the victim but observed that he had a cut on his scalp. McGlothlin also observed broken glass on the floor of the men's room.

{¶ 4} Carolyn Springer, who was tending bar at the club at the time of the assault, testified that toward the end of the evening she heard yelling "back and forth" but did not observe any physical confrontation.

{¶ 5} Deputy Alexis Harvey testified that she responded to the call and interviewed Jarrell, who told her that while using the restroom he was attacked and hit on the back of the head with a glass mug. Jarrell also reported that he was choked and

2.

thrown across the room into a stack of folding chairs. Jarrell stated that the assailant said Jarrell had "done [appellant's] nephew wrong." Deputy Harvey took photos of broken glass on the floor in the rest room stall and of swelling on the back of Jarrell's head. Harvey also spoke to Jarrell's companion and some of his friends, who did not provide any additional information. No independent witnesses came forward to report seeing a fight in the men's room. When Harvey arrived at the scene, the assailant was gone. Jarrell gave the deputy appellant's name and she followed up the following day, but "did not learn too much from him." Harvey further testified that she did not take the broken glass into evidence.

{¶ 6} Timothy McKinney, appellant's brother, testified that in 2010 he removed his son, Ian, from a baseball team coached by Jarrell because the two adults did not see eye-to-eye. McKinney stated that Jarrell told him his son was not welcome at the end-of-season party and that McKinney would be arrested for trespassing and causing a scene if he attended. McKinney believed Jarrell did not like the way McKinney allegedly conducted himself at the games. McKinney also believed his brother, appellant, felt Jarrell's actions as a coach were inappropriate, as did McKinney. McKinney read to the court an undated letter he wrote to appellant's attorney after the assault in which he detailed the reasons he believed Jarrell was a terrible coach. In the letter, McKinney admitted that when he ran into the victim's wife after the assault he "flipped her off and told her to F-off."

3.

{¶ 7} The victim's wife testified that after the assault she observed a lump on the back of Jarrell's head and some scratches on his throat. She stated that they did not go to the hospital until the following morning because of a concern as to their insurance coverage. Her husband did not require stitches but has experienced headaches and intermittent blurry vision since the assault.

{¶ 8} Deputy Jared Oliver testified he was assigned to the detective bureau on the night of the assault. A few days after the attack, Jarrell called Oliver and said he believed the person who hit him was Robert McKinney. Oliver prepared a photo array and showed it to Jarrell a few days after the incident. Jarrell identified appellant from the array as the individual who assaulted him and said he was "one hundred percent positive" of the identification. Jarrell stated that appellant threatened to kill him while he was choking him. Jarrell also told Oliver that he was diagnosed with a concussion, a sprained back and a strained neck. After speaking to Jarrell, Oliver attempted unsuccessfully to contact appellant at his residence. Oliver then consulted with another detective and the prosecutor and the decision was made to charge appellant with felonious assault. Oliver explained that the level of the offense charged in this case did not warrant calling in the Ohio Bureau of Criminal Identification and Investigation ("BCI") to examine the pieces of broken glass for DNA or fingerprints. Oliver acknowledged that, while Jarrell told the officer appellant said he would kill him, there was no mention in Deputy Harvey's incident report that Jarrell reported the threat.

4.

{¶ 9} The state next called Jonathan Smith, who was at the Vermillion County Club with his wife and Jarrell for a birthday party on the night of the assault. Smith testified that at one point during the evening Jarrell walked up to him and said he had just been jumped in the men's room and hit on the head with a beer mug. When Smith asked Jarrell who hit him, Jarrell pointed out a man sitting at the bar. Smith and Jarrell approached the individual, who was later identified as appellant, and Smith asked why he hit Jarrell. Appellant responded that Jarrell had ostracized his nephew and cut him from Jarrell's baseball team. When Smith questioned why appellant had to hit Jarrell, appellant asked Smith if he wanted to get hit with a mug. Smith backed away and his wife, who was standing nearby, called the police. At that time, appellant left the club and Jarrell took Smith to the men's room, where Smith saw broken glass on the floor. Smith saw some bumps on the back of Jarrell's head and noticed that Jarrell's eyes were glassy.

{¶ 10} Dwayne Jarrell testified that in 2009 he coached appellant's nephew, Ian, on a local baseball team. At the end of the season, he determined that he would not permit Ian to play with the team the following year because his father, Timothy McKinney, was loud and confrontational with the umpires. When Ian's father called Jarrell and asked why his son had not been chosen to return to the team, Jarrell told McKinney he considered him "a cancer in the stands." The assault in this case occurred approximately three years after that conversation. Jarrell testified that on the night of the assault, he and some friends went to the Vermillion Country Club. When he walked to the men's room at one point during the evening, he stepped into the stall and was hit on

5.

the back of his head. His knees buckled and he felt as if he were having a heart attack. He then felt someone grab him around the throat. His assailant said, "You don't know who I am, do you?" When Jarrell responded that he did not, his assailant tightened his grip. Jarrell tried to break free and told the man he must have him confused with someone else. His assailant then said, "You did my nephew wrong. I'm going to kill you." As Jarrell continued to struggle, he saw a man and a woman standing in the doorway watching. The assailant repeatedly told Jarrell he "did his nephew wrong." Finally, the man threw Jarrell into a stack of chairs and walked out of the restroom. A few seconds later, Jarrell exited the restroom and rejoined his friends. One of Jarrell's friends confronted appellant and asked why he had hit Jarrell. Appellant again referred to Jarrell having done his nephew wrong. Jarrell's friends exchanged words with appellant and then called the police. The police arrived in a few minutes and took Jarrell's statement. Jarrell reported blurry vision and headaches following the assault and stated that he sought medical attention the following morning. Jarrell testified that he had met appellant once or twice before the assault but knew him only as Tim McKinney's brother. Jarrell identified appellant in court as his assailant.

{¶ 11} The defense presented testimony from appellant's physician and two of appellant's friends. James Andrasko, M.D., a general surgeon, first saw appellant in the fall of 2011 when appellant was hospitalized for abdominal pain experienced after a hernia repair that was done by another physician. When appellant's condition worsened, Andrasko performed an exploratory laparotomy. Part of appellant's small intestine was

6.

removed and an ileostomy was put in place. On February 21, 2012, when appellant had healed from the operation, he returned to surgery and Dr. Andrasko rehooked the bowel and closed the site. Then on March 14, 2012, Andrasko removed the sutures. The doctor cautioned appellant against any heavy lifting for six to eight weeks in order to avoid tearing the incision. When the prosecutor handed the doctor a glass beer mug and asked if lifting it would have violated appellant's weight restriction, the doctor responded that it would not. Andrasko confirmed that experiencing a blow to the head with a glass beer mug could cause severe physical harm or death.

{¶ 12} Karen Greenlief testified that she had known appellant for several years and moved in with him in 2011 to help him after he underwent surgery in October of that year. She further testified that after the second surgery appellant was very weak and needed help with everyday activities. In March, after the staples in appellant's abdomen were removed, he experienced soreness and moved about slowly. On the night of March 24, 2012, Greenlief convinced appellant to go to the country club for some take-out dinner. She testified that while they were waiting for their food, appellant went to the restroom. Greenlief further testified that appellant was not carrying anything with him when he went into the restroom. When appellant walked out of the restroom, Jarrell followed him, yelling that appellant had hit him with a beer mug. She and appellant then took their food order and left.

{¶ 13} Thomas Skully, a friend of appellant's, testified that he was in the restroom when an argument started between appellant and Jarrell. He stated that appellant was in

7.

the restroom and Jarrell was standing in the doorway when he heard profanity and yelling. Skully did not see anyone get hit with a beer mug or observe any other physical confrontation. Skully left the restroom and saw appellant pick up his food and leave with his girlfriend a few minutes later. Although Skully was still at the club when the police arrived, he did not speak to any of the officers. Later that evening, Skully told appellant that the police had been called to the club. Additionally, Skully stated that he talked to appellant a few times thereafter about what he might say at trial.

{¶ 14} Lastly, the state called Rose Smith as a rebuttal witness. Smith testified that she and her husband were at the club for a friend's birthday gathering when Jarrell walked out of the restroom and told Smith and her husband that someone had hit him on the back of the head. Smith's testimony as to the sequence of events that night essentially confirmed that of her husband, Jonathan Smith.

{¶ 15} On January 18, 2013, the jury found appellant guilty of the lesser included offense of assault in violation of R.C. 2903.13(A). The trial court imposed a sentence of 120 days in the Erie County Jail. This timely appeal followed.

{¶ 16} Appellant sets forth the following assignments of error:

Assignment of Error No. 1: The prosecuting attorney failed to disclose a written summary of Appellant's oral statement given to sheriff's deputies in violation of Ohio Criminal Rule 16 and the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Assignment of Error No. 2: The prosecuting attorney's remarks during the trial and closing arguments constituted prosecutorial misconduct that deprived Appellant of a fair trial in violation of the Fifth And Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Assignment of Error No. 3: The photo array introduced to identify Appellant was unduly suggestive and unreliable and deprived Appellant of a fair trial in violation of the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Assignment of Error No. 4: Appellant's trial counsel deprived Appellant of his rights to a fair trial, the effective assistance of counsel, and due process of law a guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Assignment of Error No. 5: Appellant's conviction was not supported by sufficient evidence to prove beyond a reasonable doubt each and every element of the crime charged , and thereby deprived Appellant of the due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

Assignment of Error No. 6: The jury's verdict was against the manifest weight of the evidence and thereby deprived Appellant of the due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution and comparable provisions of the Ohio Constitution.

{¶ 17} In support of his first assignment of error, appellant asserts that he was handicapped in his trial preparation because the state failed to provide the defense with a written summary of an oral statement appellant made when he was served with the warrant in this matter.

{¶ 18} This issue arose when, after the state rested its case in chief, the trial court discovered a police report made at the time of appellant's arrest on the indictment. The report noted that when appellant was arrested, he stated, "I didn't touch the guy, it was just an argument." Defense counsel noted that he had not received the report. The prosecutor also expressed surprise that the defense had not received a copy. The record reflects that the defense did not object to the introduction of the police report into evidence and did not move for a mistrial or continuance based on having not received it.

{¶ 19} Appellant argues that the state's failure to produce his oral statement until after the close of its case in chief denied him his right of due process and a fair trial because his trial preparation was hindered, specifically in terms of deciding whether or not to take the witness stand. The record reflects a fairly lengthy discussion at the bench after the court noticed the existence of the report and called it to the attention of the

10.

prosecutor and defense counsel. Despite the lengthy discussion, however, defense counsel ultimately did not object to the introduction of the police report into evidence or move for a continuance or mistrial based on the failure to receive the report.

{¶ 20} Because appellant did not object to the admission of the police report into evidence, he has waived all but plain error. *State v. Ross*, 6th Dist. Huron No. H-11-022, 2013-Ohio-1595; Crim.R. 52(B). "Plain error does not exist unless, but for the error, the outcome of the proceedings would have been different." *State v. Moreland*, 50 Ohio St.3d 58, 552 N.E.2d 894 (1990).

{¶ 21} After reviewing the entire record in this case as set forth above, we find no plain error. Appellant has not shown that knowledge of the statement, "It was only an argument," in the police report before the trial court brought it to his attention would have benefitted him in the preparation of his defense. He has failed to show that defense counsel's trial strategy would have been different had he been aware of the report and appellant's statement contained therein before the state presented its case in chief. This court is unable to see how this statement alone would have influenced the outcome of the trial. We find no indication that the statement had any impact on the decision-making process regarding waiver of a jury or appellant's decision not to testify, as appellant asserts. Considering that defense and prosecution witnesses placed appellant in or near the restroom at the time of the offense, the only other issue was the nature and extent of injuries suffered by the victim; the statement made by appellant would have had no impact on the jury's decision as to Jarrell's injuries.

11.

**{¶ 22}** Accordingly, based on the foregoing, appellant's first assignment of error is not well-taken.

**{¶ 23}** In support of his second assignment of error, appellant asserts that various remarks made by the prosecutor during the trial and closing argument were improper and inflammatory.

**{¶ 24}** Generally, "[p]rosecutorial misconduct occurs when the prosecutor makes a statement that is improper and the improper statement causes prejudice to appellant." *State v. Stowers*, 6th Dist. Erie No. E-12-055, 2014-Ohio-147, ¶ 39, citing *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).

**{¶ 25}** First, appellant argues that the prosecutor questioned state's witness Deputy Oliver in a manner that was irrelevant and designed to "draw a direct correlation between the credibility of the state's witness and the prestige of the prosecutor's office." Seeking to rebut defense counsel's questions on cross as to why the BCI was not called to the scene, the prosecutor asked the deputy if he remembered "a time when you and I were standing outside the residence where that triple homicide occurred?" The deputy responded in the affirmative and the prosecutor continued, "We called BCI in that, correct?" Deputy Oliver responded, "We did." The deputy testified that BCI is called to assist only in the case of a "very, very violent act that could potentially become a homicide."

**{¶ 26}** Appellant insisted at trial that the BCI should have been called in by the sheriff's office. The prosecutor's line of questioning during re-direct clearly was

12.

intended to reinforce the point that the BCI is generally called only in cases of violent acts and homicides. Rather than an attempt to bolster the state's credibility, the prosecutor's questions appear to have been intended to explain why the BCI was not called in to test for DNA and fingerprints on the broken beer mug. Further, we note that this line of questioning regarding the failure to call BCI was initiated by defense counsel during his cross-examination of Deputy Oliver. This argument is without merit.

{¶ 27} Next, appellant asserts that the prosecutor made numerous inflammatory and improper remarks during his cross-examination of witnesses Karen Greenlief and Thomas Skully. Specifically, appellant argues that the prosecutor improperly questioned Greenlief about appellant's silence after the incident occurred. During cross-examination of Greenlief, the state asked the following: "Bob McKinney never picked up the phone and called the police, did he?" Defense counsel objected and the objection was overruled. The state then asked: "And the reason why isn't because Mr. McKinney is innocent of these charges, isn't that the case?" Greenlief responded, "No, that's not the case." We find no impropriety with that line of questioning, as the state was merely questioning the witness as to appellant's actions after the incident and asking the jury to make reasonable inferences therefrom.

{¶ 28} Appellant further argues that the state improperly attacked witness Thomas Skully's character when the prosecutor asked Skully whether he was appellant's "drinking buddy," and whether he had ever "hear[d] of the term surprise witness." The

13.

prosecutor also questioned Skully as follows: "Now, I noticed on direct examination you didn't quite stick to the script, did you?"

{¶ 29} Evid.R. 607(A) clearly allows an attack on a witness' credibility although it restricts such attacks by *the party calling the witness*. In this case, Skully was called as a defense witness and the reference in the transcript is to cross-examination by the state. Skully was not the state's witness. Upon consideration of the foregoing, we find the attack on the credibility of this witness was proper.

{¶ 30} Additionally, appellant asserts that during closing argument the prosecutor commented improperly on the testimony of several witnesses. The following comments by the prosecutor are cited by appellant as inappropriate:

So the testimony of Dwayne Jarrell was consistent, it was truthful, and it was very credible * * *.

[T]he final witness, really Rose was probably one of the most credible witnesses we saw here.

Their inconsistencies prove that they are very truthful and credible people. * * * If they were not credible, * * * they would have got their stories straight * * *.

{¶ 31} As to witness Skully, the prosecutor stated: "He was your eyewitness and he was so incredible it's almost laughable. This is a guy that's a convicted felon, has two names, and drinks with the defendant." As to the testimony of defense witness Greenlief, the prosecutor stated: "this idea that Karen Greenlief had to beg the defendant to go

14.

down to a bar that night is ridiculous.  He was meeting Skully, his drinking buddy.  I mean, it's * * * ludicrous."

{¶ 32} Prosecutors are generally entitled to considerable latitude in opening and closing arguments.  *State v. Balew*, 76 Ohio St.3d 244, 667 N.E.2d 369 (1996).  During closing arguments, the prosecution is free to comment upon that which the evidence has shown and any reasonable inferences that can be drawn therefrom.  *State v. Lott*, 51 Ohio St.3d 160, 555 N.E.2d 293 (1990).  Most significantly, any claimed misconduct of counsel during closing arguments must be considered in the context of the entire case to determine if it resulted in actual prejudice to the defendant.  *State v. Lorraine*, 66 Ohio St.3d 414, 613 N.E.2d 212 (1993).

{¶ 33} Lastly, appellant asserts that the prosecutor misstated the burden of proof and the definition of proof beyond a reasonable doubt with the following comments:

What is reasonable doubt?  You have to – you have to find that one of these positions, if you will, and I'm not exactly sure what it is yet, I guess we'll hear it in closing argument (inaudible) the positions of the defense is reasonable, like this never happened.

* * *

So as you work through this process, think about that, because if it's not reasonable, folks, rational, logical to believe that, given all the evidence, then there's no reasonable doubt.

{¶ 34} While perhaps inartfully stated, we are unable to find that the prosecutor's language was an attempt to shift the burden of proof to appellant. At no time did the prosecutor state that the defense carried the burden of establishing reasonable doubt. Further, we note that the trial court properly instructed the jury as to the state's burden, stating that "[t]he defendant must be acquitted, unless the State of Ohio * * * produces evidence which convinces you beyond a reasonable doubt of every element of the crime."

{¶ 35} We note that defense counsel did not object to any of the aforementioned comments by the prosecutor. "Failure to object to the alleged misconduct of the prosecutor at trial means that an appellant will have waived all but plain error." *State v. Bickley*, 6th Dist. Erie No. E-09-024, 2010-Ohio-1480, ¶ 23. Further, "[p]lain error does not exist unless, but for the improper comments of the prosecutor the outcome of defendant's trial would clearly have been different; that is, he would not have been convicted." *Id.*

{¶ 36} We have carefully considered the allegations of prosecutorial misconduct in this matter. We find that the record of evidence reflects no impropriety in the disputed statements by the prosecutor during closing arguments or during his questioning of the witnesses as described above, and therefore no prejudice to appellant. The comments cited by appellant appear to have been intended to direct the jury to the consistencies and inconsistencies of several witnesses for the state and the defense. Upon consideration of the foregoing, we find that the statements cited by appellant did not meet the criteria for plain error. Having reviewed the trial testimony in its entirety, we cannot say that but for

16.

the prosecutor's comments the outcome of the trial would clearly have been different. Accordingly, appellant's second assignment of error is not well-taken.

{¶ 37} In support of his third assignment of error, appellant asserts that the photo array shown to Jarrell was unduly suggestive and unreliable. Appellant argues that Jarrell was just as likely to have identified appellant based on past associations with him as he was to have identified him based on the assault. Additionally, appellant argues that the photo array was essentially a "one-on-one show up" because it contained appellant's photograph and five other random individuals whom Jarrell did not know which, according to appellant, made it likely that Jarrell would have easily eliminated the other five individuals, leaving only appellant.

{¶ 38} R.C. 2933.83 requires any law enforcement agency that conducts live and photo lineups to adopt "specific procedures" for conducting the lineups. R.C. 2933.83(B). Such procedures must provide, at minimum, the use of a "blind or blinded" administrator for the array. R.C. 2933.83(B)(1). Our review of the record shows that the photo array in question complied with the requirements set forth in R.C. 2933.83. Chief Deputy Oliver testified at length as to the procedure he employed in assembling the photo array and in arranging for a "blind administrator" to show it to Jarrell. Appellant's argument that the photo array was unduly suggestive or unreliable because Jarrell had past contact with appellant is without merit. We find that no error occurred and, accordingly, appellant's third assignment of error is not well-taken.

17.

{¶ 39} In support of his fourth assignment of error, appellant asserts that he received ineffective assistance of trial counsel. Appellant cites counsel's failure to object to the report of appellant's oral statement at the time of his arrest, the improper remarks made by the prosecutor during the trial and closing argument, and admission of the photo array.

{¶ 40} It is well-established that claims of ineffective assistance of counsel are reviewed under the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 104 St.Ct. 2052, 80 L.Ed.2d 674 (1984). In order to prove ineffective assistance of counsel, appellant must demonstrate both that the performance of trial counsel was defective and that, but for that defect, the outcome would have been different. *Id.* at 687. We note that, in support of his argument, appellant raises issues we addressed under the previous three assignments of error and found to be without merit. Applying *Strickland* to the instant case, we are unable to find upon our review of the record that trial counsel was ineffective in any respect. Accordingly, appellant's fourth assignment of error is not well-taken.

{¶ 41} Appellant's fifth and sixth assignments of error will be addressed together. In his fifth assignment of error, appellant asserts that his conviction was not supported by sufficient evidence to prove each and every element of the crime charged. In support, appellant argues that the state failed to prove that appellant caused physical harm to Jarrell. In support of his sixth assignment of error, appellant asserts that the jury's verdict was against the manifest weight of the evidence. Appellant argues there was no physical

18.

evidence connecting him to the injuries suffered by Jarrell and no one in the bar witnessed the physical altercation, with the only direct evidence being Jarrell's testimony.

{¶ 42} The term "sufficiency" of the evidence presents a question of law as to whether the evidence is legally adequate to support a jury verdict as to all elements of the crime. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The relevant inquiry in such cases is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 43} "In contrast, a manifest weight challenge questions whether the state has met its burden of persuasion." *State v. Davis*, 6th Dist. Wood No. WD-10-077, 2012-Ohio-1394, ¶ 17, citing *Thompkins, supra*, at 387. In making this determination, the court of appeals sits as a "thirteenth juror" and, after "reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins, supra*, at 386.

{¶ 44} Appellant was convicted of assault, in violation of R.C. 2903.13(A), which states that "[n]o person shall knowingly cause or attempt to cause physical harm to another * * *."

19.

**{¶ 45}** This court has reviewed the applicable law, as well as the trial court's record, including the oral testimony of each witness as summarized above.  Upon due consideration, we find that any rational trier of fact could have found the essential elements of the offense of assault proven beyond a reasonable doubt.  In addition, we find, after reviewing the entire record and weighing the evidence and all reasonable inferences, that the trier of fact did not lose its way in reaching its verdict.  Accordingly, appellant's fifth and sixth assignments of error are not well-taken.

**{¶ 46}** On consideration whereof, the judgment of the Erie County Court of Common Pleas is affirmed.  Costs of this appeal are assessed to appellant pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.        _____

                    JUDGE

Thomas J. Osowik, J.

                    _____

James D. Jensen, J.         JUDGE
CONCUR.

                    _____

                    JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions.  Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.